IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ENERQUEST OIL & GAS, LLC and § <br> CHIEFTAIN ENERGY LLC, § <br>     Plaintiffs, § <br> § <br> V. § <br> § <br> PLAINS EXPLORATION & § <br> PRODUCTION COMPANY, EOG § <br> RESOURCES, INC., DENIS BRYSCH, § <br> RACHEL BRYSCH, LISA ANN LABUS, § <br> KEVIN V. LABUS, KAREN S. BRYSCH, § <br> LEONARD MOY, JR., EDWIN MOY, § <br> DIANE PAPE, LEROY MOY, and § <br> ADELENE MANKA, § <br>     Defendants. § | Civil Action No. SA-12-CA-00542-DAE |

**PLAINTIFFS' RESPONSE TO THE MINERAL OWNERS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF THIS COURT:

    Plaintiffs, EnerQuest Oil & Gas, LLC ("EnerQuest") and Chieftain Energy LLC ("Chieftain"), who will be jointly referred to as "Plaintiffs," file this response to the motion for partial summary judgment (Document 126) filed by the Mineral Owners.

**I.
INTRODUCTION**

    In 2008, Plaintiffs acquired two oil, gas, and mineral leases, the Moy Lease and the Brysch Lease (collectively, "the Leases"). The Mineral Owners have moved for partial summary judgment on two grounds and judgment on the pleadings on a third ground, as follows: (1) they contend that, under their interpretation of the Leases, Plaintiffs did not timely tender shut-in royalty payments, and thus the Leases purportedly terminated; (2) they assert that, when the primary terms of the Leases ended and Plaintiffs' Brysch No. 1 Well (the "Well") was shut-in,

the Well was not "capable of producing in paying quantities," as required by the Leases, and the Leases purportedly terminated; and (3) they argue that Plaintiffs are not entitled to relief, including attorneys' fees, on their declaratory judgment cause of action. The Mineral Owners' motion should be denied in its entirety.

Plaintiffs have previously moved for partial summary judgment on the first two grounds raised in the Mineral Owners' motion. Plaintiffs also have responded to a motion for partial summary judgment filed by Defendant Plains Exploration and Production Company ("PXP") concerning the first ground. *See* Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation (Document 122) and Plaintiffs' Response to Plains Exploration and Production Company's Motion for Partial Summary Judgment (Document 119). Plaintiffs incorporate by reference their motion for partial summary judgment and their response to PXP's motion.

The Mineral Owners' motion fails, as a matter of law, on all three grounds. (1) The Mineral Owners' interpretation of the Leases ignores a provision that makes clear that Plaintiffs' tender of shut-in royalty payments was timely. (2) Plaintiffs' assertions about the standard and evidence concerning whether the Well was capable of producing in paying quantities are erroneous and misplaced. (3) By their own motion, the Mineral Owners raise a dispute about the proper interpretation of the Leases, which makes a declaratory judgment necessary and accompanying attorneys' fees proper.

## II.
## EVIDENCE IN SUPPORT OF THIS RESPONSE

Plaintiffs' evidence offered in support of this Response is included in the Appendix filed on even date herewith.

## III.
## AUTHORITIES AND ANALYSIS

**A.     Plaintiffs timely tendered shut-in royalty payments in accordance with the terms of the Leases.**

The Mineral Owners contend that Plaintiffs did not tender shut-in royalty payments on time, based on their interpretation of the Leases that relies on one clause in paragraph 3(c). But their interpretation ignores a later clause in paragraph 3(c) that controls and that confirms tender of the payments plainly was timely.

A "delay rental" is a sum of money payable to the lessor by the lessee for the privilege of delaying the commencement of drilling operations or the commencement of production during the primary term of an oil and gas lease. 8 Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil & Gas Law, Manual of Terms* (2001).

Both the Brysch and Moy leases are "paid-up" leases and therefore, do not require the payment of delay rentals to maintain either lease during their primary terms. *See* Plaintiffs' Motion for Partial Summary Judgment on Maintenance of their Leases and Repudiation, p. 3. Under a paid-up lease, the delay rentals are paid when the lease is executed, and this single payment maintains the lease during the primary term. Ernest E. Smith and Jacqueline Lang Weaver, *Texas Law of Oil & Gas* §4.3[A][3](2d ed. 2012). *See also* 3 Kuntz, *A Treatise on the Law of Oil & Gas*, §28.6 (1989).

The habendum clause of each Lease is found in paragraph 2 and states as follows:

> This lease shall be in force for a primary term of 2 years from the effective date hereof, and for so long thereafter as a covered mineral is produced in paying quantities from the leased premises or this lease is otherwise maintained in effect pursuant to the provisions hereof.

Importantly, as the foregoing habendum clause illustrates, neither the Brysch nor Moy Lease is an "unless" lease with a delay rental clause providing for automatic termination of the lease

3

*unless* a well is drilled or delay rentals paid during the primary term. *Id.* at §4.3[A][1]. The absence of the "unless" clause confirms that the Leases are paid-up leases, with the delay rentals having been fully paid when the Leases were executed. In addition, the top right corner of each page of the main form of each Lease bears the notation "Paid Up" and further confirms that the delay rentals were paid at execution and that none are due during the primary terms of these leases. Ex. A.

The Mineral Owners' interpretation of the time period within which Plaintiffs were obligated to pay shut-in royalties relies on a clause in paragraph 3(c) of the Leases, quoted by the Mineral Owners as follows:

> [I]f, *during* or after *the primary term* one or more wells on the leased premises or lands pooled therewith are capable of producing oil or gas…in paying quantities, but such well or wells are either shut-in or production therefrom is not being sold by Lessee for a period of 90 consecutive days, then Lessee may pay shut-in royalty of one dollar per acre of land…on or before the end of said 90-day…and it shall be considered that such well is producing in paying quantities for all purposes hereof….

Mineral Owners' motion, p. 8 (emphasis by Mineral Owners). The Mineral Owners argue that, because this clause in paragraph 3(c) refers to "*during* or after *the primary term*," and because Plaintiffs shut the well in shortly before the end of the primary terms of the Leases, Plaintiffs were obligated to tender the payments within 90 days after the shut-in date, not within 90 days after the end of the primary terms. Mineral Owners' motion, pp. 8-9.

The Mineral Owners, however, disregard the fact that the Leases are paid-up leases, and they ignore the controlling clause in paragraph 3(c) that follows the one they quoted. The controlling clause states as follows:

> …; *provided that if this lease is otherwise being maintained by the payment of rentals* or by operations, or if a well or wells on the leased premises is producing

4

> in paying quantities, *no shut-in royalty shall be due until the end of the 90-day period next following the end of the rental period* or the cessation of such operations or production, as the case may be.

Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation, p. 4 (emphasis added). Because the Leases are paid-up leases, "the end of the rental period" referred to in this clause coincides with the end of the Leases' two-year primary terms. Consequently, in order to maintain the Leases after their primary terms ended, Plaintiffs had to tender the first shut-in royalty payment on or before 90 days following the end of the Leases' primary terms and had to tender each following shut-in royalty payment on or before the end of each successive 90-day period. *Id.* As a matter of law, Plaintiffs did so. *Id.* at 11-13.

The Mineral Owners recognize the legal effect of the controlling clause in paragraph 3(c) of the Leases in paragraph 4 of their motion. In that paragraph, the Mineral Owners concede that "[l]ike the Moy Lease, [the Brysch Lease] also provided that its term could be extended by shut-in royalties in the absence of actual production if there was a well on the Brysches' land, or other land pooled with it, that was capable of producing in paying quantities, provided that the shut-in royalties were tendered within 90 days of… the end of delay rentals…." As noted above, because the delay rentals were "paid-up" when the Leases were executed, the end of the delay rental period coincides with the end of the Leases' two-year primary terms.

In his 1984 article on shut-in royalty payments, Professor John S. Lowe, one of the authors contributing to the Kuntz treatise on oil and gas law, discussed the shut-in royalty clause in the context of a paid-up lease as follows:

> Under a paid-up lease, the delay rental payment problems are largely eliminated because all rentals are deemed paid in advance for the primary term. Suppose, however, that a well is completed and shut-in on the leased premises during the primary term of the paid-up lease. Must shut-in royalties be paid? The apparent answer would be that shut-in royalty payments would be required if the shut-in

5

> clause was obligatory in its wording; if it provided that "lessee *shall* pay…." However, payment should not be required if the clause language is permissive; "lessee *may* pay…." Of course, the more important question is what happens if lessee fails to make payment? On the basis of the analysis above, the answer should be that the lease will remain in effect for the remainder of the primary term because it will be maintained by the paid-up rentals, regardless of the language of the shut-in clause.

John S. Lowe, *Shut-In Royalty Payments*, 5 E. Min. L. Inst. 18-26 (emphasis in original). The shut-in provisions in the Brysch and Moy leases are of the *may pay* variety. Paragraph 3(a) of the Leases as quoted above and Mineral Owners' Motion, p. 8. Consequently, the Leases remained in effect for the entireties of their primary terms because they were maintained by the paid-up rentals, regardless of the timing of the Well's shut-in.

The Mineral Owners' interpretation of the Leases is wrong, and their motion on this ground should be denied.

**B.      The Well was capable of producing in paying quantities when the shut-in period began in accordance with paragraph 3(c) of the Leases.**

The Mineral Owners make two arguments about why the Well purportedly was not capable of producing in paying quantities at the end of the Leases' primary terms. Both are meritless.

First, the Mineral Owners assert that an $84,000.00 expense for connecting the Well to a nearby pipeline made the Well "uneconomic to connect it." Mineral Owners' motion, p. 11. In support of this argument, the Mineral Owners rely on statements in an email by EnerQuest's representative, Greg Olson, when Mr. Olson was negotiating the contract for the pipeline connection. *Id.* at 12. As the email itself discloses, however, Mr. Olson was merely trying to negotiate a lower price. The email from which the Mineral Owners quote ended with this question from Mr. Olson: "Can you give any consideration to reducing the hookup fee?" *Id.*, Ex.

F to Mineral Owners' Motion, at 2. At Mr. Olson's deposition, he reiterated that he made the statements in his email in order to try to negotiate a lower price, as the Mineral Owners acknowledge in their motion. *Id.* at 12. In addition, it is undisputed that, at the end of the day, Plaintiffs decided that the Well would be "economical" and capable of producing in paying quantities, because they agreed to incur the cost of the pipeline connection. *Id.*, Ex. F, at 1. For a more detailed explanation of why the Mineral Owners' summary judgment evidence purporting to show that the Well was not economical should not be credited, *See* Ex. B, pp. 3-8.

The Mineral Owners appear to suggest that the Well had to be capable of producing sufficient oil and gas to immediately recover the $84,000 connection charge, Mineral Owners' motion, p. 12, but no legal authority supports that proposition. They also dismiss as "irrelevant" Mr. Olson's testimony that he would have implemented plans to enhance production from the Well but has delayed doing so because of the Mineral Owners' and other defendants' "cloud on title." *Id.*, Ex. G, at 10. This testimony, however, is directly relevant because, shortly after the Leases' primary terms ended, the Mineral Owners granted the Dan Hughes Leases and thereby repudiated the Leases; and once the Mineral Owners repudiated the Leases, Plaintiffs were relieved of all obligations to maintain the Leases pending a resolution of this lawsuit. *See* authorities discussed in Plaintiffs' Motion for Partial Summary Judgment on Maintenance of their Leases and Repudiation, pp. 15-17.

The Mineral Owners' second argument about why the Well purportedly was not capable of producing in paying quantities is because, after the shut-in period began, Plaintiffs replaced surface equipment – "a separator, storage tanks, [and] pipelines connecting them." Mineral Owners' motion, p. 13. This argument is founded on a misunderstanding about Texas law's

definition of when a "well" is "capable of producing in paying quantities" – a topic that has been thoroughly addressed in Plaintiffs' previous summary judgment papers.

First, the Supreme Court of Texas has defined a "well" as the hole in the ground and equipment in that hole necessary to produce oil or gas. Second, Texas courts have explicitly held that a "well" is "capable of producing in paying quantities" when the *well itself* is fully equipped and operational, even if surface equipment for treating and transporting produced minerals is thereafter constructed, installed, repaired, or replaced. The entire purpose of a shut-in royalty payment is to allow the Lessor to establish a gas market – that is, negotiate a gas purchase and sale agreement – and, if successful, to construct, install, repair, or replace surface equipment to treat and to transport the gas. Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation, pp. 8-11; Plaintiffs' Response to Plains Exploration & Production Company's Motion for Partial Summary Judgment, pp. 2-5. It would make no sense to pay the cost for surface facilities downstream from the Well until such time as the Well was connected to a pipeline.

The Mineral Owners take issue with the court of appeals' holding in *Blackmon v. XTO Energy, Inc*., 276 S.W.3d 600, 603 (Tex. App. – Waco 2008, no pet.), that the well in that case was capable of producing in paying quantities despite the fact that surface equipment downstream from the well had to be installed after the well was shut-in. The Mineral Owners attempt to portray *Blackmon* as an aberration. Mineral Owners' motion, p. 16. But *Blackmon* is consistent with the opinion of the Supreme Court of Texas in *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550 (Tex. 2002). In *Anadarko*, the supreme court distinguished between "production in paying quantities" and "capable of production in paying quantities." "Production" of minerals in paying quantities contemplates *actual production* and requires both that the well

be fully equipped and operational *and* that all equipment downstream from the well be connected to the well and operational. *Anadarko*, 94 S.W.3d at 557. "Capable" of production, by contrast, does not contemplate actual production and focuses only on the well, requiring that it be fully equipped and operational, but not requiring that all equipment downstream from the well be in place and operational or even that a contract for the sale and purchase of product be in place. This is vividly illustrated by the supreme court's holding that Anadarko had maintained the lease because its well was fully equipped and operational, even though it was not actually producing and was shut-in because of the need to make equipment repairs downstream from the well. *Id*. at 557-58. *See* Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation, pp. 8-9; *see also* discussion of and citation to deposition testimony of EOG's former Eagle Ford Division Land Manager, *Id.* at p. 7.

A sworn affidavit from Defendant Kevin Labus, one of the Mineral Owners, confirms the producing status of the Well as late as February 27, 2012. In a Drilling Title Opinion dated April 15, 2011, prepared by PXP's law firm and addressed to PXP's landman, PXP's attorneys issued a title curative requirement that PXP obtain an affidavit of non-production after noting the existence of the Brysch Lease and EnerQuest's unit designation, with the word "Caution" printed in red on the title curative requirement. *See* Plaintiff's Response to Plains Exploration & Production Company's Motion for Partial Summary Judgment, pp. 7-8. In an attempt to fulfill the title curative requirement imposed by its attorneys related to the validity of the Leases, PXP obtained an affidavit from Mr. Labus in which he identified the Well as the only well on the property, attested that the Well was currently (as of February 27, 2012) producing, and stated that the property had been pooled into the Brysch No. 1 Unit. *Id.* On June 5, 2012, a different set of PXP title attorneys issued three "Title Status Letters" covering the leasehold title to all of the

property at issue in this lawsuit, each of which referred to the earlier Drilling Title Opinion and noted that the title curative requirement of an affidavit of non-production was "*not satisfied.*" *Id.* (emphasis in original). Despite the Mineral Owners' contentions in their motion to the contrary, the sworn testimony of one of the Mineral Owners establishes that the Well was capable of production.

Finally, as established in Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation, the Well has produced in paying quantities at all times relevant to this dispute. Ex. F. to Plaintiffs' Motion for Partial Summary Judgment on Maintenance of Their Leases and Repudiation.

**C.     Plaintiffs are entitled to a declaratory judgment interpreting the Leases and to attorneys' fees associated with that declaratory relief.**

In the alternative to partial summary judgment, the Mineral Owners move for a partial judgment on the pleadings determining that Plaintiffs are not entitled to any relief on their declaratory judgment cause of action, including attorneys' fees. The Mineral Owners argue that the only method for determining title to real property under Texas law is through a claim for trespass to try title. Mineral Owners' motion, pp. 17-20. What the Mineral Owners apparently overlooked, however, is that the first ground in their motion confirms that there is a dispute between Plaintiffs and the Mineral Owners over the proper interpretation of the Leases, a dispute addressed in part A, above. Because this dispute requires construction of the Leases, Plaintiffs have a viable cause of action for a declaratory judgment and for the recovery of attorneys' fees.

Under Texas law, when a dispute – including a title dispute – requires interpretation of a deed, contract, or oil and gas lease, a declaratory judgment and accompanying award of attorneys' fees are available. For example, in *EOG Resources, Inc. v. Killam Oil Company, Ltd.*, 239 S.W.3d 293 (Tex. App. – San Antonio 2007, pet. denied), several parties litigated a dispute

10

over ownership of production from an oil and gas property. The parties' interests arose from three oil and gas leases, two farmout agreements, and other agreements. Killam and another entity brought suit against EOG for a declaratory judgment that EOG's title had terminated. The trial court rendered declaratory judgment for plaintiffs and awarded them attorneys' fees under the Texas Declaratory Judgments Act. The court of appeals affirmed. The court of appeals first construed the agreements and determined that EOG's interest had terminated. *Id.* at 297-302. Next, the court of appeals rejected EOG's assertion that the trial court erred in awarding attorneys' fees to plaintiffs under the Declaratory Judgments Act on the ground that plaintiffs' lawsuit was a suit to try title. The court quoted the Declaratory Judgments Act and upheld the award of attorneys' fees. *Id.* at 304.

In *City of China Grove v. Morris*, No. 04-10-00763-CV, 2011 Tex. App. LEXIS 9260 (Tex. App. – San Antonio Nov. 23, 2011, pet. denied), Morris fenced off Edwards Drive, adjacent to his home, preventing public access to the street. The City sent Morris a letter notifying him that Edwards Drive was a public street within the corporate limits of the City and requesting that he remove the fencing. The letter stated that official City records, including meeting minutes, established that the street had been dedicated to the City. Morris filed suit against the City seeking a declaration that Edwards Drive was not a public roadway and also seeking attorneys' fees. *Id.* at *2. During discovery, Morris provided the City with deeds and records showing that title to Edwards Drive was in Morris's name. The City thereafter stipulated that Edwards Drive was Morris's private property, and the parties proceeded to a bench trial solely on the issue of attorneys' fees. In its answer and at the bench trial, the City contested the propriety of a declaratory judgment suit and contended that only a trespass to try title claim was proper. *Id.* at *2-3. The trial court disagreed and rendered a final order in which it found that the

suit was properly brought under the Declaratory Judgments Act and that Morris was entitled to recover attorneys' fees from the City. *Id.* at *3. The court of appeals affirmed, reasoning in part that "because the suit pertained to construction of a written document affecting Morris's property interest [that is, the City's minutes], suit was authorized under the Declaratory Judgments Act and the trial court did not err in awarding attorneys' fees." *Id.* at *8; *see also Sunwest Operating Co. v. Classic Oil & Gas Co., Inc.*, 143 Fed. Appx. 614, 620 (5th Cir. 2005) (affirming declaratory judgment resolving a dispute over mineral interests as to certain acreage by construing assignments of oil and gas leases, and rejecting argument that trespass to try title was proper claim, rather than declaratory judgment, thus affirming award of attorneys' fees); *Ruiz v. Stewart Mineral Corp.*, 202 S.W.3d 242, 247 (Tex. App. – Tyler 2006, pet. denied) (affirming declaratory judgment concerning dispute over mineral interest resolved by construing power of attorney and deed, and upholding right to recover attorneys' fees but remanding for segregation of work on declaratory judgment claim from other claims).

The Mineral Owners' cite two opinions, *Martin v. Amerman*, 133 S.W.3d 262 (Tex. 2004) and *Ramsey v. Grizzle*, 313 S.W.3d 498 (Tex. App. – Texarkana 2010, no pet.), and suggest that these opinions hold that trespass to try title is the exclusive remedy for title disputes under Texas law. Mineral Owners' motion, p. 19.

In *Amerman*, the Supreme Court of Texas said, "The Declaratory Judgments Act provides an efficient vehicle for parties to seek a declaration of rights under certain instruments, while trespass-to-try-title actions involve detailed pleading and proof requirements." *Amerman*, 133 S.W.3d at 265. The court's opinion, however, did not focus on distinguishing between those two types of claims and the differing circumstances in which each is applicable, but rather on the issue of whether boundary disputes are subsumed within trespass to try title claims – and the

court said yes. *Id.* at 265-68. *Amerman* does not purport to foreclose a declaratory judgment claim when resolution of that claim requires construction of a deed, lease, or other instrument, as is the case here. *See, e.g.*, *Ruiz,* 202 S.W.3d at 248-49 (discussing "title established by deed construction" and distinguishing *Amerman*); *Sunwest*, 143 Fed. Appx. at 620 (distinguishing *Amerman* and holding that the construction of assignments of oil and gas leases "is a proper subject for a declaratory judgment action").

In *Ramsey*, the court said, "*When the suit does not involve the construction or validity of deeds or other documents of title*, the suit is not one for declaratory judgment." *Ramsey*, 313 S.W.3d at 503 (emphasis added). Here, this suit is in part one for declaratory judgment, as the Mineral Owners' motion confirms.

## IV.
## RELIEF REQUESTED

Plaintiffs EnerQuest Oil & Gas, LLC and Chieftain Energy LLC request that the Mineral Owners' motion for partial summary judgment and motion for partial judgment on the pleadings be denied and that Plaintiffs be granted such other and further relief to which they are entitled.

Respectfully submitted,

Jackson, Sjoberg, McCarthy & Townsend, LLP
711 W. 7th Street
Austin TX  78701
(512) 472-7600
(512) 225-5565 FAX


By:    /s/ John Matthew Sjoberg
John Matthew Sjoberg
State Bar No. 18451480
msjoberg@jacksonsjoberg.com

David E. Jackson
State Bar No. 10458500
djackson@jacksonsjoberg.com
(admitted *pro hac vice*)


ATTORNEYS FOR PLAINTIFFS
ENERQUEST OIL & GAS, LLC AND
CHIEFTAIN ENERGY LLC

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notification to the parties of the suit were made as noted below:

McELROY, SULLIVAN & MILLER, LLP
Michael E. McElroy
1201 Spyglass Dr., Ste. 200
P.O. Box 12127
Austin, TX 78711
Tel.: (512) 327-8111
Fax: (512) 327-6566
Attorneys for Defendant Plains Exploration & Production Company
**Via CM/ECF System**

McGINNIS, LOCHRIDGE, & KILGORE, LLP
Patton G. Lochridge
600 Congress Ave., Ste. 2100
Austin, TX 78701
Tel.: (512) 495-6000
Fax: (512) 495-6093
Attorneys for Defendant EOG Resources, Inc.
**Via CM/ECF System**

WALKER KEELING, LLP
Ronald B. Walker
120 S. Main St., Suite 500
P.O. Box 108
Victoria, TX 77902-0108
Tel: (361) 576-6800
Fax: (361) 576-6196
Attorneys for Denis Brysch, Rachel Brysch, Lisa Ann Labus, Kevin V. Labus, Karen S. Brysch, Leonard Moy, Jr., Edwin Moy, Diane Pape, Leroy Moy, and Adelene Manka
**Via CM/ECF System**

                                             /s/  John Matthew Sjoberg
                                               John Matthew Sjoberg